**No. 2014-1517**

# United States Court of Appeals
## for the
## Federal Circuit

———— • ————

PRINCETON VANGUARD, LLC,

*Appellant,*

v.

FRITO-LAY NORTH AMERICA, INC.,

*Appellee.*

*Appeal from the United States Patent and Trademark Office, Trademark Trial and Appeal Board · Cataldo, Taylor and Ritchie, Administrative Trademark Judges*

## BRIEF OF APPELLEE

WILLIAM G. BARBER
PAUL MADRID
PIRKEY BARBER PLLC
600 Congress Avenue, Suite 2120
Austin, Texas 78701
(512) 322-5200 Telephone
(512) 322-5201 Facsimile

*Attorneys for Appellee,*
*Frito-Lay North America, Inc.*

 

# <u>CERTIFICATE OF INTEREST</u>

Counsel for Appellee Frito-Lay North America, Inc. certifies the following:

**1.     The full name of every party or amicus represented by me is:**

Frito-Lay North America, Inc.

**2.     The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:**

None.

**3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:**

PepsiCo, Inc.

**4.     The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:**

Office of General Counsel, Frito-Lay North America, Inc.:
Jeanette Zimmer

Pirkey Barber PLLC:  William G. Barber, Susan J. Hightower, and Paul Madrid

Dated:  September 25, 2014            ____/s/ William G. Barber_____
                                                                   William G. Barber

# <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ..................................................................iv

STATEMENT OF RELATED CASES ............................................ viii

STATEMENT OF THE ISSUES...................................................1

STATEMENT OF THE CASE AND FACTS .......................................1

    1.    Procedural history.................................................................1

    2.    No dispute concerning genericness of "pretzel" .................4

    3.    Evidence of the generic meaning of "crisps".......................5

        a.    Frito-Lay and third parties use "crisps" as a generic synonym for crackers .................................................5

        b.    Dictionary definitions show "crisps" is generic ........................8

        c.    PTO registration practice shows that "crisps" is generic for crackers.......................................................8

        d.    Princeton uses "crisps" generically...........................10

    4.    Evidence of the generic meaning of combined term "pretzel crisps" ..................................................................12

        a.    Third-party, media, and consumer use of "pretzel crisps" as a generic category name .....................................12

        b.    Surveys show that the majority of relevant consumers do not perceive "pretzel crisps" as a mark................14

SUMMARY OF ARGUMENT .............................................................16

ARGUMENT ....................................................................................17

    1.    The standard of review:  substantial evidence ....................17

    2.    Standards for analyzing genericness ...................................19

    3.    The Board reasonably found PRETZEL CRISPS generic for pretzel crackers ..........................................................24

        a.    It was reasonable to conclude that "crisps" means crackers .......................................................24

      b.    The compound term "pretzel crisps" as a whole adds
no meaning to its generic constituent words.............................27

      c.    It was also reasonable to find PRETZEL CRISPS generic
when evaluated as a whole without reference to its
constituent parts .......................................................................32

4.    The objections raised by Princeton and amicus are either wrong
or insufficient to overcome the Board's reasonable finding...............35

      a.    Princeton confuses questions of law and fact ...........................35

      b.    The Board did not fail to consider the record ...........................41

      c.    The Board did not cherry-pick the media evidence.................42

      d.    Princeton's complaints concerning the adequacy
of the Board's reasoning are misplaced ....................................45

      e.    Princeton and amicus misinterpret the Board's
conclusions on the survey evidence ..........................................47

      f.    Princeton fails to establish any inconsistency in Board
decisions ....................................................................................50

CONCLUSION ........................................................................................52

CERTIFICATE OF SERVICE .................................................................53

CERTIFICATE OF COMPLIANCE.........................................................54

# TABLE OF AUTHORITIES

## CASES

*Blinded Veterans Ass'n v. Blinded Am. Veterans Found.*,
   872 F.2d 1035 (D.C. Cir. 1989)...................................................23

*Bridgestone/Firestone Research, Inc. v. Auto. Club De L'Quest De La Fr.*,
   245 F.3d 1359 (Fed. Cir. 2001) ...............................................17

*Classic Foods Int'l Corp. v. Kettle Foods, Inc.*,
   468 F. Supp. 2d 1181 (C.D. Cal. 2007)......................................48

*Consol. Aluminum Corp. v. Foseco Int'l Ltd.*,
   910 F.2d 804 (Fed. Cir. 1990) .............................................46, 47

*Consol. Edison Co. v. NLRB*,
   305 U.S. 197 (1938)................................................................18

*Cummins Engine Co. v. Cont'l Motors Corp.*,
   359 F.2d 892 (CCPA 1966)..................................23, 24, 27, 28, 29

*Dickinson v. Zurko*,
   527 U.S. 150 (1999)................................................................18

*E.I. DuPont de Nemours & Co. v. Yoshida Int'l, Inc.*,
   393 F. Supp. 502 (E.D.N.Y. 1975) ...........................................14

*Fischer & Porter Co. v. U.S. Int'l Trade Comm'n*,
   831 F.2d 1574 (Fed. Cir. 1987) ...............................................19

*Frito-Lay N. Am., Inc. v. Princeton Vanguard, LLC*,
   109 USPQ2d 1949 (TTAB 2014)......................3, 20, 35, 36, 48, 49

*Glaverbel S.A. v. Northlake Mktg.*,
   45 F.3d 1550 (Fed. Cir. 1995) ...............................................46, 48

*H. Marvin Ginn Corp. v. Int'l Ass'n of Fire Chiefs*,
   782 F.2d 987 (Fed. Cir. 1986) ...............................................20, 35

*Hunt Masters, Inc. v. Landry's Seafood Rest., Inc.*,
   240 F.3d 251 (4th Cir. 2001) ...............................................23, 49

*In re 1800Mattress.com IP LLC*,
   586 F.3d 1359 (Fed. Cir. 2009) .......................................19, 21, 23

*In re Abcor Dev. Corp.*,
   588 F.2d 811 (CCPA 1978) ............................................................................23

*In re Am. Fertility Soc'y*,
   188 F.3d 1341 (Fed. Cir. 1999) .................... 21, 22, 23, 24, 35, 36, 37, 38, 39

*In re Bos. Beer Co.*,
   198 F.3d 1370 (Fed. Cir. 1999) ....................................................................40

*In re Dial-A-Mattress Operating Corp.*,
   240 F.3d 1341 (Fed. Cir. 2001) ...........................................22, 24, 36, 37, 38

*In re Gould Paper Corp.*,
   834 F.2d 1017 (Fed. Cir. 1987) ........ 21, 22, 23, 26, 27, 30, 31, 35, 36, 37, 39

*In re Greenliant Sys., Ltd.*,
   97 USPQ2d  1078 (TTAB 2010) ...........................................................28, 45

*In re Hotels.com, LP*,
   573 F.3d 1300 (Fed. Cir. 2009) ...............................................3, 17, 21, 38, 48

*In re Kahn*,
   441 F.3d 977 (Fed. Cir. 2006) ................................................................18, 46

*In re Merrill Lynch, Pierce, Fenner & Smith*,
   828 F.2d 1567 (Fed. Cir. 1987) ........................................................21, 43, 44

*In re Nett Designs, Inc.*,
   236 F.3d 1339 (Fed. Cir. 2001) ....................................................................39

*In re Nordic Naturals, Inc.*,
   755 F.3d 1340 (Fed. Cir. 2014) ..............................................................17, 39

*In re Pacer Tech.*,
   338 F.3d 1348 (Fed. Cir. 2003) ....................................................................18

*In re Sang-Su Lee*,
   277 F.3d 1338 (Fed. Cir. 2002) .......................................................45, 46, 47

*In re Steelbuilding.com*,
   415 F.3d 1293 (Fed. Cir. 2005) ..............................................................17, 23

*Int'l Flora Techs., Ltd. v. Desert Whale Jojoba Co.*,
   No. 92048102 (TTAB Feb. 23, 2010) ..........................................................22

*J.P. Stevens Co. v. Lex Tex Ltd.*,
   822 F.2d 1047 (Fed. Cir. 1987) ..............................................................18, 41

*Kan. Jack, Inc. v. Kuhn*,
    719 F.2d 1144 (Fed. Cir. 1983) ...................................................19

*Kenner Parker Toys Inc. v. Rose Art Indus., Inc.*,
    963 F.2d 350 (Fed. Cir. 1992) ....................................................42

*Lloyd's Food Prods., Inc. v. Eli's, Inc.*,
    987 F.2d 766 (Fed. Cir. 1993) ....................................................42

*Loglan Inst. Inc. v. Logical Language Grp. Inc.*,
    962 F.2d 1038 (Fed. Cir. 1992) ..................................................21

*Mag Instrument, Inc. v. Brinkman Corp.*,
    96 USPQ2d 1701 (TTAB 2010) .................................................41

*Magic Wand Inc. v. RDB, Inc.*,
    940 F.2d 638 (Fed. Cir. 1991) ..............................................20, 43

*Miller Brewing Co. v. Jos. Schlitz Brewing Co.*,
    605 F.2d 990 (7th Cir. 1979) ......................................................50

*N.V. Akzo v. E.I. DuPont de Nemours*,
    810 F.2d 1148 (Fed. Cir. 1987) ............................................19, 41

*Nat'l Conference of Bar Exam'rs v. Multistate Legal Studies, Inc.*,
    692 F.2d 478 (7th Cir. 1982) ................................................23, 24

*On-Line Careline, Inc. v. Am. Online, Inc.*,
    229 F.3d 1080 (Fed. Cir. 2000) ..................................................18

*Perkin-Elmer Corp. v. Computervision Corp.*,
    732 F.2d 888 (Fed. Cir. 1984) ....................................................19

*Recot, Inc. v. Becton*,
    214 F.3d. 1322 (Fed. Cir. 2000) .................................................42

*Reese Publ'g Co. v. Hampton Int'l Comm'ns, Inc.*,
    620 F.2d 7 (2d Cir. 1980) ...........................................................24

*Roux Labs., Inc. v. Clairol Inc.*,
    427 F.2d 823 (CCPA 1970) ........................................................19

*Schwan's IP, LLC v. Kraft Pizza Co.*,
    460 F.3d 971 (8th Cir. 2006) ......................................................49

*Singer Mfg. Co. v. June Mfg. Co.*,
    163 U.S. 169 (1896) ....................................................................19

*SSIH Equip. S.A. v. U.S. Int'l Trade Comm'n,*
    718 F.2d 365 (Fed. Cir. 1983) ...............................................................18, 43

*SunTiger v. Sci. Research Funding Grp.,*
    189 F.3d 1327 (Fed. Cir. 1999) ....................................................................40

*Surgicenters of Am., Inc. v. Medical Dental Surgeries, Co.,*
    601 F.2d 1011 (9th Cir. 1979) ......................................................................24

*Winner Int'l Corp. v. Wolo Mfg. Corp.,*
    905 F.2d 375 (Fed. Cir. 1990) ...............................................................18, 41

*Yamaha Int'l Corp. v. Hoshino Gakki Co.,*
    840 F.2d 1572 (Fed. Cir. 1988) ....................................................................20

## REGULATIONS

37 C.F.R. § 2.129(c) ..........................................................................................46, 48

## RULES

Fed. Cir. R. 28 .........................................................................................................1

## STATUTES

15 U.S.C. § 1052 ....................................................................................................40

15 U.S.C. § 1057 ....................................................................................................20

## OTHER AUTHORITIES

2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*
    (4th ed. 2012) ..........................................................................................26, 41

*Trademark Manual of Examining Procedure* (Rev. 1983) .....................................43

Vincent N. Palladino, *Surveying Secondary Meaning,*
    84 Trademark Rep. 155 (1994) ....................................................................34

## __STATEMENT OF RELATED CASES__

There are no related cases pending in this Court.

## STATEMENT OF THE ISSUES[1]

The record contains substantial evidence that the compound term "pretzel crisps" is generic based on dictionary definitions of the components, generic use of both components and the whole term by third parties, and generic use by Appellant Princeton Vanguard LLC ("Princeton") itself.  The record also contains competing survey evidence, including Princeton's surveys which suffer from notable flaws. Based on the entire record, could a reasonable fact-finder find that "pretzel crisps" is generic for pretzel crackers?

## STATEMENT OF THE CASE AND FACTS

### 1.    Procedural history

This is a straightforward case. Princeton seeks to register PRETZEL CRISPS—a compound term consisting entirely of generic words —for "pretzel crackers." "Pretzel" is disclaimed and indisputably generic for this type of product. "Crisps" has long been used generically in the snack food industry, including by Princeton itself on its own packaging and in advertisements:



---

[1] Appellee disagrees with Princeton's Statements of the Issues, the Case and the Facts, and therefore submits these Statements pursuant to Circuit Rule 28(a)(6), (7), (8), and (b).

(A90, 7932, 7934-35.) In addition to Princeton's own generic use of the term "crisps", numerous third parties in the snack food industry use the term generically through sales of pita crisps, wheat crisps, cheese crisps, soy crisps, and other cracker products, demonstrating that the relevant public perceives "crisps" for what it is: a synonym for "crackers." Together, the words "pretzel" and "crisps" form a compound term identical in meaning to the genus of Princeton's goods: "pretzel crackers."

Based on these facts, Appellee Frito-Lay North America, Inc. ("Frito-Lay") opposed Princeton's application to register the generic term PRETZEL CRISPS on the Principal Register and petitioned to cancel its registration on the Supplemental Register.[2] In addition to submitting evidence of dictionary definitions, the media's use, third party use in the food industry, and use by the parties themselves, the parties commissioned three surveys relevant to the question of genericness, with each party's survey experts criticizing the methodology of the other side. After the Trademark Trial and Appeal Board ("TTAB" or "Board") denied the parties' motions for summary judgment, the parties agreed to try the case solely on the summary judgment record, without introducing any testimonial depositions but

---

[2] Frito-Lay also opposed and petitioned to cancel on the grounds that the purported mark is so highly descriptive of the applied for goods that it is incapable of acquiring distinctiveness or is merely descriptive without acquired distinctiveness, but the Board did not reach those issues as it found the purported mark generic.

instead submitting additional affidavits from the survey experts. *Frito-Lay N. Am., Inc. v. Princeton Vanguard, LLC*, 109 USPQ2d 1949, 1950 (TTAB 2014).

At trial on the merits, the Board made the factual determination that the term "pretzel crisps" is generic for pretzel crackers. *Id.* at 1959-60. Finding that "pretzel crisps" is a compound term, the Board concluded that, based on the record, "[t]he commonly understood meaning of the words 'pretzel' and 'crisps,' demonstrates that purchasers understand that 'PRETZEL CRISPS' identifies 'pretzel crackers.'" *Id.* at 1960. In its analysis, the Board specifically addressed the surveys of two of the parties' experts, Dr. Deborah Jay for Princeton and Dr. Alex Simonson for Frito-Lay, outlining the conclusions of each expert along with several defects that each party's survey expert found in the other party's survey. *Id.* at 1957-58. The Board found that the surveys did not merit controlling weight in this case, instead giving controlling weight to dictionary definitions, the media's use, third party use in the food industry, and especially Princeton's own generic use. *Id.* at 1960 (citing *In re Hotels.com, LP*, 573 F.3d 1300 (Fed. Cir. 2009)). The Board also found that, were "pretzel crisps" a phrase instead of a compound term, the result would be the same "as the words strung together as a unified phrase also create a meaning that we find to be understood by the relevant public as generic for 'pretzel crackers.'" *Id.*

Based on the factual conclusion that "pretzel crisps" is generic for pretzel crackers, the Board refused registration on the Principal Register and canceled the registration on the Supplemental Register. *Id.* Princeton did not request reconsideration or modification of the decision. (A30, 33.) Princeton now appeals to this Court seeking to overturn the Board's reasonable factual conclusion that was supported by substantial evidence.

## 2. <u>No dispute concerning genericness of "pretzel"</u>

There is no dispute that the term "pretzel" is generic for Princeton's products. Indeed, "pretzels" were the goods for which Princeton initially applied to register PRETZEL CRISPS (A36), but this attempt was refused (A43-44). In response to the refusal, Princeton disclaimed "pretzel," amended its identification of goods to "pretzel crackers," and amended the application to the Supplemental Register. (A62-65.) Princeton carried forward these concessions in its more recent application to register PRETZEL CRISPS on the Principal Register by contemporaneously filing an amendment to register under Section 2(f) (which concedes the lack of inherent distinctiveness) and again disclaiming "pretzel." (A218, 221.) Princeton has long referred to its products using the generic name "pretzels," such as in advertising that its goods are "[m]ade with all natural pretzels" and that they "begin with all natural pretzels" before "removing the middle." (A233-35.)

### 3.   <u>Evidence of the generic meaning of "crisps"</u>

The word "crisps"—long used in Britain generically to designate potato chips—has evolved in the United States over the past few decades to become a generic name for crackers and similar crisp snack products. Frito-Lay, numerous third parties, and Princeton itself have frequently used "crisps" as a generic term for "crackers" and other types of crisp snacks. (*E.g.*, A5356-57.)

#### a.   **Frito-Lay and third parties use "crisps" as a generic synonym for crackers**

In the snack food industry, the term "crisps" was first and most frequently used on potato-based snack items; however, generic industry usage of "crisps" has expanded to other items, such as crackers, breads, cheese, bagels and pita, among others. (*Id.*) New products called "crisps" are launched frequently in the snack food industry. (*Id.*)  In fact, trade publications discussing Princeton's own products reflect this progression. For instance, the June 2008 issue of *Snack Food & Wholesale Bakery* notes that "pretzels have joined chips to become crisps." (A8726.) Another publication referred to both Princeton's pretzel crackers and its unregistrable "ciabatta crisps" as "crisps." (A8728.) The June 2011 issue of *Fancy Food & Culinary Products* featured a whole category of "Crackers & Crisps," which included Princeton's products. (A8730.)

The USDA likewise uses the words "chips" and "crisps" interchangeably. (A5371.) International groups such as the Food & Agriculture Organization of the

United Nations and the World Health Organization, furthermore, rely on the generic term "crisps" to connote processes and styles of ready-to-eat snack food items. (A5373-74.)

Frito-Lay has made and sold a wide variety of products, including crackers, for which the word "crisps" is part of the generic product descriptor. (A5356.) Information Resources Inc., a third-party database, lists nearly 700 UPC codes for salty snack products in the United States where the product name or descriptor includes the word "crisp" or "crisps," accounting for many millions of dollars of sales. (A8640-8707.)

A visit to any grocery store snack or cracker aisle demonstrates that many third parties use "crisps" as a generic term in association with an array of different kinds of crackers. These include, but are not limited to:

- 34° crisps (A8296)

- CHEEZ-IT crisps (A5403)

- Deerfield Farms Oven Crisps baked crisp snacks (A8263-65)

- Doctor Kracker fire roasted crisps (A8168, 8248)

- Family Foods savory snack crisps (A5294)

- Genisoy multigrain crisps (A8223, 8257-58)

- GOLDFISH crisps (A8268-69)

- Gold'N Krackle cheese & oregano crisps (A8319)

- H-E-B wheat crisps entertainer crackers (A8172, 8250)

- Inter-American Products baked wheat crisps snack crackers (A8329)

- Keebler WHEATABLES nut crisps crackers (A8251)

- Kroger baked wheat crisps and baked multigrain crisps (A8322, 8326)

- Lesley Stowe Raincoast Crisps crackers (A8176, 8252)

- Mishpacha cracker crisps (A8271-75)

- Nabisco CHEESE NIPS thin crisps crackers (A8170, 8249)

- Pepperidge Farm Baked Naturals cheese crisps (A8180, 8254) and wheat crisps (A8253)

- Special K cracker crisps (A8285, 8288)

- Target baked cheese crisps (A8321)

- Topco Associates all natural ranch soy crisps (A8319)

- Triscuit thin crisps baked whole grain wheat crackers (A8164, 8166, 8246-47)

- Vineyard Collection focaccia crisps (A8293)

- World Gourmet garden veggie crisps (A8318).

Consumers and news media also commonly use "crisps" alone to name Princeton's products or discuss them as part of the "crisp" category. (A8226-8242.)

Many competitors in the snack food industry (including Princeton itself, as discussed further in part 3.d below) have used the term "crisps" generically to indicate serving sizes when providing nutritional information for various cracker products. For example, Pepperidge Farm uses "crisps" in this manner in connection with a pretzel cracker product directly competitive with Princeton's products. (A5230.) Other snack makers who provide nutrition information for a number of "crisps" include at least Frito-Lay, Pringles, Kitchen Table Bakers, John Wm. Macy, Sensible Portions, and Genisoy. (A5356-57, 5365, 5367, 5369, 8218-24.)

### b.    Dictionary definitions show "crisps" is generic

As the meaning of "crisps" for snacks has evolved and continues to evolve, multiple dictionaries now define the noun "crisp" as a generic name for products such as those made by Princeton. The first definition of the noun "crisp" in *Merriam-Webster's Collegiate Dictionary* is "something crisp or brittle." One of two examples provided is "rye crisps." (A8545, 8547.) In *The American Heritage College Dictionary*, the first definition of the noun "crisp" is "Something crisp or easily crumbled." (A8561.) The *Collins English Dictionary* defines the noun "crisp" as "something that is crisp." (A8559.)

### c.    PTO registration practice shows that "crisps" is generic for crackers

Third-party registrations incorporating a generic term for the food product followed by "crisps," notably BAGEL CRISPS and PITA CRISPS (which Frito-

Lay submits also are now generic), date to the 1980s. However, newer applications following this construction repeatedly have been refused registration. This is true of both of Princeton's own applications to register CIABATTA CRISPS for "crackers made from toasted bread" and "Italian bread toast, namely ciabatta toasted crackers." (A8369, 8372-73, 8376, 8378.) As one Examining Attorney wrote, "Industry usage indicates that the word 'CRISPS' is a generic term that is synonymous with the term CHIP that refers to a thin, firm, and brittle snack food." (A5540; *see also* A8383; A8391 ("[I]f applicant's snacks are crisp, they may be generically referred to as a type of crisp."))

More than 800 live applications and registrations include "crisps" in goods descriptions in Classes 29 and 30. (A8394.) Scores disclaim "crisps" for goods including crackers. (A8418, 8598-8633.) There are many disclaimers of "crisps" and refusals to register on the Principal Register many "___ CRISPS" (and phonetically identical "___ KRISPS") marks in Classes 29 and 30 for snack foods, including crackers. The PTO has found such names to be generic or merely descriptive for snack foods in Classes 29 and 30. (A7899-7902.) A few recent examples in which registration has been refused or disclaimer of "crisps" required include:

- BISCOTTI CRISPS for grain-based snack foods (A8539.68, 8539.71-.72)

- PARMESAN CRISPS for cookies and crackers, among others (A8539.88, 8539.92)

- BAKED LENTIL CRISPS for vegetable-based snack foods (A8539.75, 8539.78-.79)

- LEAN CRISPS for cookies and crackers, among others (A8539.82, 8539.84-.85)

- POP-TARTS MINI CRISPS for crackers (A8380, 8383)

-  for organic food package combinations consisting primarily of bread, crackers and/or cookies; organic wheat-based snack foods; etc. (A8448, 8451)

d. **Princeton uses "crisps" generically**

Princeton (through its exclusive licensee The Snack Factory) has long called its products by the generic name "crisps," not only prominently on the front of various packaging and point-of-sale displays, but also for many years on all packages of the products in the "Nutrition Facts" reference box. (A8192, 8208-11.) During the pendency of this proceeding, Princeton changed the "Serving Size" in this box from "11 Crisps" to "11 Crackers," further demonstrating the equivalence of the terms "crisps" and "crackers."



(A8208, 8215.) As can be seen above, Princeton substituted "Crackers" for "Crisps" in the same location in the nutrition facts of its product, using the same ordinary type face, and using both terms to identify the type of Princeton's product, not the source of the product.

Princeton's founder Warren Wilson testified that Princeton redesigned its packaging in July 2010, resulting in the phrase "NEW LOOK, MORE CRISPS" appearing prominently on the front of the bag. (A8750-51.)  At that same time Wilson said, Princeton switched from using "Crisps" to "Crackers" in the Nutrition Facts. (*Id.*)  Thus on every single one of the millions of packages from the introduction of its products in October 2004 (*see* A7386) until the package redesign in July 2010—nearly six years—Princeton presented "Crisps" as a generic term in the Nutrition Facts box.  Princeton then substituted "Crackers" for "Crisps" using the same typeface, size, position, and capitalization, indicating to consumers that the two terms are synonymous.

Princeton has also used "crisps" as a generic term in many other contexts, such as press releases, emails, advertisements, presentations, and award applications. (A8569-95.)  Its Vice President for Marketing conceded that "pretzel crisps" is "two pretty generic words." (A8567.)

11

**4.**   **Evidence of the generic meaning of the combined term "pretzel crisps"**

    **a.**   **Third-party, media, and consumer use of "pretzel crisps" as a generic category name**

Multiple times in recent years, the media has used "pretzel crisps" to refer to a category name for pretzel crackers, including those made by Princeton and others. For example, in 2012, Slashfood rated Princeton's product in a taste test as the best of the "pretzel crisps" category. (A7946-51.) ChefsBest and Consumer Reports also have ranked Princeton's product and other species in the "pretzel crisps" category. In 2008, three products were judged by ChefsBest in the pretzel crisps category; in 2010, ChefsBest gave the award for best pretzel crisp to Pepperidge Farm Pretzel Thins. (A7953-59.) In 2009, when Consumer Reports included the pretzel crisps category among its review of the "tastiest snack crisps," it did not mention Princeton's product at all, but wrote under the "pretzel crisps" heading: "New York Style's are large crunchy triangles, very toasted, with a big pretzel flavor. Pepperidge Farms' are large, crunchy, flattened pretzels that are a little buttery and sweet." (A7961.) The same year, the San Francisco Chronicle rated six products in the "pretzel crisps" category, in a story using "cracker," "chips," and "crisps" interchangeably. (A7964-65.) "Pretzel crisps" also is often used generically in news stories and elsewhere to refer to Princeton's products— even where Princeton contends the term is also rendered as a brand—as well as similar products made by others. (*See* A7945-8016 (containing over 20 examples

of generic use of "pretzel crisps"); A6912-14, 6928-30, 6932-33, 6938, 6946, 6969-70, 6973, 6989-90, 6999-7000, 7004-06, 7007-09, 7013-15, 7016-17, 7019, 7020, 7023-24, 7033-34, 7047- 7048-49, 7053-55, 7056-57, 7058-59, 7062, 7064-65, 7065-66, 7067-68, 7072, 7077, 7085-86, 7091-92, 7092-93, 7096-97, 7101-02, 7103-04, 7117 (55 articles using "pretzel crisps" generically with no reference to Princeton); A7040, 7049-50, 7051-52, 7062-63, 7068-70, 7072-73, 7076-77, 7082-83, 7084-85, 7089-90, 7094-95, 7097 (15 articles referencing Princeton's affiliate Snack Factory but also using "pretzel crisps" generically); A6960, 6961-62, 6964, 7035-36, 7037-39, 7039-40, 7042-45 (articles referencing RITZ MUNCHABLES pretzel crisps).)  Princeton presented no evidence that it made any effort to stop or even object to these generic uses by the media.  In sum, the evidence includes over 100 generic uses of "pretzel crisps" by the media and other participants in the food industry.

Third-party snack sellers have also used "pretzel crisps" as a category name and generic product descriptor.  For example, when Kraft Foods first launched a line of pretzel cracker products under the mark RITZ MUNCHABLES in 2010, it prominently displayed "pretzel crisps" on the front packaging as the generic descriptor for the product.  (A7647, 7655.)  Kraft continued using "pretzel crisps" as a generic term in this manner for some five months, after which it changed the generic descriptor to "pretzel thins" and "pretzel rounds." (*See* A5944, 7648-49,

7625.)  Similarly, private label pretzel maker Pretzels Inc. advertised its product as belonging in the "pretzel crisp market" at a trade show in 2011. (A8022.) When Princeton complained, Pretzels Inc. stated the obvious: that its "use of the generic term 'pretzels crisps' was merely a reference to a particular market segment described in industry publications" and that the industry used "pretzel crisps" generically. (A8018.) Indeed, in 2007, one such industry publication used "pretzel crisps" generically, with no reference to Princeton, throughout an entire lengthy article. (A7968-75.)

Consumers likewise refer to Princeton's product and similar or related products generically as "pretzel crisps." (*See generally* A8025-54.) For example, a comment submitted to Princeton compared pretzel crisps, pita crisps, and soy crisps (A8025), while other consumers referenced manufacturers of competing pretzel crisps. (A8029, 8031, 8034, 8038.)

### b.    Surveys show that the majority of relevant consumers do not perceive "pretzel crisps" as a mark

Both parties commissioned experts to conduct a survey in the style used to test the genericness of the mark TEFLON in *E.I. DuPont de Nemours & Co. v. Yoshida International, Inc.*, 393 F. Supp. 502 (E.D.N.Y. 1975). Both experts criticized the results of the other. Dr. Simonson's[3] survey (commissioned by Frito-

---

[3] Dr. Simonson is an extremely well qualified expert in the field of marketing research and consumer surveys, with extensive experience designing and

14

Lay) found that well under half of respondents—41%—thought "pretzel crisps" was a brand name. The remaining respondents either thought that "pretzel crisps" was a category name (41%) or were unsure (18%). (A6572, 6580, 7854-58.) These findings indicate that the relevant public does not primarily perceive "pretzel crisps" as a brand name. (A6580, 7854-58.)

Although Dr. Simonson included questions to determine whether survey participants understood the difference between brand names and generic terms (A8812), Dr. Jay (retained by Princeton) nevertheless criticized Dr. Simonson's survey as not conducting a "mini-test" to assure they understood the difference (A6463). Dr. Jay's survey produced only slightly better numbers for Princeton, with just barely over half of her respondents saying "pretzel crisps" was a brand name. (A7863-64.) However, Dr. Jay excluded more than one-third of the respondents from the relevant universe (an extraordinarily high number of excluded consumers) on the basis that they lacked familiarity with certain salty snack names, so the survey does not support a claim regarding a purported majority of all relevant consumer views. (*Id.*)

Princeton also commissioned a survey by Mr. George Mantis that purportedly measured secondary meaning, but actually blended the concept of

---

conducting surveys for trademark cases. For a summary of Dr. Simonson's qualifications, see A7851-54, 7878-87.

genericness by instructing respondents that "brand names" (*i.e.* trademarks) are associated with "one particular company" (secondary meaning), while "common names" (*i.e.* generic terms) are associated with "more than one company" (no secondary meaning). (A7690-91.) As explained by Frito-Lay's expert Dr. Ivan Ross,[4] a much higher percentage of respondents said they associated the term "pretzel crisps" with more than one company—and, considering the survey instructions, with a common name—than with just one company. (A7691-92.) Results of the Mantis survey thus show that the primary significance of the term "pretzel crisps" is generic: 47.8% of respondents viewed it as a common name associated with more than one company, compared to only 38.7% who thought it was a brand name associated with only one particular company. (*Id.*)

## SUMMARY OF ARGUMENT

The evidence of record is more than sufficient to support the Board's factual finding that "pretzel crisps" is a generic compound term with the same meaning as its generic components. In the face of this evidence, the Board's finding that "pretzel crisps" is a generic term for pretzel crackers is more than reasonable.

Realizing the heavy burden it faces to overturn an agency's factual determinations, Princeton attempts to transform the Court's review of this case

---

[4] Like Dr. Simonson, Dr. Ross is a highly qualified and experienced expert in the field of market research and consumer surveys. (A7685-88, 7695-7716.)

from one of fact to one of law, but the "legal issues" it alleges are simply not present. The Board properly understood and faithfully followed this Court's precedents concerning the genericness inquiry and the weight to give the evidence before it. In reality, Princeton simply disagrees with the Board's ultimate factual conclusion that "pretzel crisps" is a generic term. Because the Board's findings are eminently reasonable and supported by substantial evidence, the Court should reject Princeton's attempt to disrupt this Court's settled authority and, instead, affirm the reasonable conclusion of the fact-finder.

## ARGUMENT

### 1.    The standard of review:  substantial evidence

The genericness of a purported mark is purely a question of fact. *E.g.*, *In re Nordic Naturals, Inc.*, 755 F.3d 1340, 1342 (Fed. Cir. 2014); *In re Hotels.com, LP*, 573 F.3d 1300, 1302 (Fed. Cir. 2009).  "On appellate review of the Board's factual finding of genericness, we determine whether, on the entirety of the record, there was substantial evidence to support the determination." *In re Hotels.com*, 573 F.3d at 1302 (citing *In re Steelbuilding.com*, 415 F.3d 1293, 1296 (Fed. Cir. 2005)); *accord Bridgestone/Firestone Research, Inc. v. Auto. Club De L'Quest De La Fr.*, 245 F.3d 1359, 1361 (Fed. Cir. 2001).

"The substantial evidence standard requires the reviewing court to ask whether a reasonable person might find that the evidentiary record supports the

agency's conclusion." *On-Line Careline, Inc. v. Am. Online, Inc.*, 229 F.3d 1080, 1085 (Fed. Cir. 2000) (citing *Dickinson v. Zurko*, 527 U.S. 150, 162 (1999)). "Substantial evidence is 'more than a mere scintilla' and 'such relevant evidence as a reasonable mind would accept as adequate to support a conclusion.'" *In re Pacer Tech.*, 338 F.3d 1348, 1349 (Fed. Cir. 2003) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). This review should take into account the applicable degree of proof required at trial. For instance, a decision that would be reversed if the standard of proof were clear and convincing evidence may nevertheless be affirmed on the same record if the standard of proof is simply preponderance. *SSIH Equip. S.A. v. U.S. Int'l Trade Comm'n*, 718 F.2d 365, 383 (Fed. Cir. 1983) (Nies, J., additional comments).

Although an agency must take care not to base its decision on matters not properly of record, *see In re Kahn*, 441 F.3d 977, 989 (Fed. Cir. 2006), a decision is nevertheless supportable even if the fact finder does not articulate in detail its consideration of every single piece of evidence in its written opinion. *See, e.g.*, *Winner Int'l Corp. v. Wolo Mfg. Corp.*, 905 F.2d 375, 376 (Fed. Cir. 1990) (rejecting argument that trial court improperly ignored evidence solely because it was not mentioned in the analysis); *J.P. Stevens Co. v. Lex Tex Ltd.*, 822 F.2d 1047, 1053 (Fed. Cir. 1987) (trial court "was not obligated to list, and reject, factors that might have supported a contrary decision" to the one it reached);

18

*N.V. Akzo v. E.I. DuPont de Nemours*, 810 F.2d 1148, 1152 n.5 (Fed. Cir. 1987) ("The mere fact that the district court does not include findings on all the evidence is not indicative that it was not considered." (citing *Kan. Jack, Inc. v. Kuhn*, 719 F.2d 1144, 1150-51 (Fed. Cir. 1983))); *see also Perkin-Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 894 (Fed. Cir. 1984) ("We review judgments, however, not passing statements.").

After performing the review for substantial evidence, the Court may realize that both the decision reached by the agency and the contrary decision urged by the appellant are reasonable. *E.g., Fischer & Porter Co. v. U.S. Int'l Trade Comm'n*, 831 F.2d 1574, 1577 (Fed. Cir. 1987). In that case, the Court will affirm the agency's decision even if the contrary happens to appear more reasonable, a concept that some appellants "find difficult to accept." *Id.*

## 2.    Standards for analyzing genericness

The generic name of a product is the antithesis of a mark. *Roux Labs., Inc. v. Clairol Inc.*, 427 F.2d 823, 829 (CCPA 1970). There can be more than one generic name for a product; indeed, "any term that the relevant public understands to refer to the genus . . . is generic." *In re 1800Mattress.com IP LLC,* 586 F.3d 1359, 1364 (Fed. Cir. 2009). Generic names are in the public domain, free for all to use. *See Singer Mfg. Co. v. June Mfg. Co.*, 163 U.S. 169, 199-200 (1896).

"The critical issue in genericness cases is whether members of the relevant public primarily use or understand the term sought to be protected to refer to the genus of goods or services in question." *H. Marvin Ginn Corp. v. Int'l Ass'n of Fire Chiefs,* 782 F.2d 987, 989-90 (Fed. Cir. 1986). An inquiry into the public's understanding has two steps: "First, what is the genus (category or class) of goods or services at issue? Second, is the term sought to be registered understood by the relevant public primarily to refer to that genus (category or class) of goods or services?" *Id.* at 990. In the context of an *inter partes* proceeding, the applicable degree of proof on the issue of genericness is preponderance of the evidence.[5] *Magic Wand Inc. v. RDB, Inc.*, 940 F.2d 638, 642 (Fed. Cir. 1991). The public's understanding can be demonstrated through several competent sources, including dictionaries, trade journals, newspapers, publications, and consumer surveys.

---

[5] At trial, the parties disputed which of them bore the burden of proof on the issue of genericness. Frito-Lay argued that, based on *Yamaha International Corp. v. Hoshino Gakki Co.*, the trademark applicant should bear the ultimate burden of proof on the question of trademark validity both in an opposition against a principal registration and in a cancelation against a supplemental registration because to hold otherwise "would give the applicant for a trademark the rebuttable presumption of validity that properly follows only the registration of the mark." 840 F.2d 1572, 1581 (Fed. Cir. 1988) (citing 15 U.S.C. § 1057(b)). The Board ultimately placed the burden on Frito-Lay, citing cases involving the cancelation of registrations on the Principal Register wherein the presumption of validity is present and thus not on point for the case at bar. *See Frito-Lay N. Am.*, 109 USPQ2d at 1952 (citing *Magic Wand Inc. v. RDB, Inc.*, 940 F.2d 638 (Fed. Cir. 1991)). The Court need not consider this issue at this juncture because substantial evidence nevertheless supports the Board's finding of genericness; it would only be relevant in the event of a remand.

*Loglan Inst. Inc. v. Logical Language Grp. Inc.*, 962 F.2d 1038, 1041 (Fed. Cir. 1992); *In re Merrill Lynch, Pierce, Fenner & Smith*, 828 F.2d 1567, 1570 (Fed. Cir. 1987).  One of the strongest sources of evidence can be the term's generic use by the trademark applicant itself. *See, e.g.*, *In re Gould Paper Corp.*, 834 F.2d 1017, 1019 (Fed. Cir. 1987).

In general, the genericness inquiry focuses on determining the understanding of a purported mark as a whole by the relevant public. *In re Am. Fertility Soc'y*, 188 F.3d 1341, 1347 (Fed. Cir. 1999).  However, one well settled way of proving the public's understanding of the mark as a whole occurs when the purported mark is a compound term consisting merely of two generic words—*i.e.,* a mark formed by the combination of generic terms in ordinary grammatical construction. In that case, "if the compound word would plainly have no different meaning from its constituent words, and dictionaries, or other evidentiary sources, establish the meaning of those words to be generic, then the compound word too has been proved generic." *In re Am. Fertility Soc'y*, 188 F.3d at 1347 (citing *In re Gould*, 834 F.2d at 1018); *see also In re 1800Mattress.com IP, LLC*, 586 F.3d 1359, 1363 (Fed. Cir. 2009) (Board appropriately considered the separate meanings of "mattress" and ".com" when determining that the combination "mattress.com" was generic); *In re Hotels.com, L.P.*, 573 F.3d 1300, 1304 (Fed. Cir. 2009) ("the composite term HOTELS.COM communicates no more than the common

meanings of the individual components"); *In re Dial-A-Mattress Operating Corp.*, 240 F.3d 1341, 1345 (Fed. Cir. 2001). "No additional proof of the genericness of the compound word is required." *In re Am. Fertility Soc'y*, 188 F.3d at 1347. In fact, this type of proof provides clear and convincing evidence that the mark as a whole is generic. *See, e.g.*, *In re Dial-A-Mattress*, 240 F.3d at 1345 (holding that the PTO may satisfy its *ex parte* burden of proving a compound term generic by producing evidence sufficient to meet the *Gould* standard).

A purported mark may be considered a compound term under this analysis regardless of whether presented as two words with a space between them, or as one word. *In re Gould*, 834 F.2d at 1019 ("Whether compounded as 'screen wipe'— two words—or 'screenwipe'—one word—either is ordinary grammatical construction."); *Int'l Flora Techs., Ltd. v. Desert Whale Jojoba Co.*, No. 92048102, slip op. at 24-25 (TTAB Feb. 23, 2010) (non-precedential) ("The space between the generic terms 'jojoba butter' and 'beads' does not disqualify the mark from the *Gould* analysis. . . . If anything, the terms appearing as they should in normal usage make it even more recognizable a generic term.").

Although the method of examining compound terms looks to individual components of a mark, it nevertheless constitutes an examination of the meaning of the mark as a whole because it looks to whether the compound word has the same meaning as its constituent words, *i.e.* whether "the whole may be greater than the

sum of its parts." *In re Am. Fertility Soc'y*, 188 F.3d at 1348. If it does not have a different meaning, *i.e.* if the whole is not greater than the sum of its parts, then it logically follows that "the terms remain as generic in the compound as individually, and the compound thus created is itself generic." *In re Gould*, 834 F.2d at 1019; *accord In re 1800Mattress.com*, 586 F.3d at 1363; *In re Steelbuilding.com*, 415 F.3d at 1297; *see also In re Am. Fertility Soc'y,* 188 F.3d at 1348 (noting that *Gould*, properly interpreted, is simply another method of analysis of the mark as a whole rather than a way of avoiding the analysis entirely).

Analysis of compound terms in this manner has been a part of this Court's trademark precedent for nearly fifty years, if not longer. *E.g.*, *In re Abcor Dev. Corp.*, 588 F.2d 811, 815 (CCPA 1978) (Rich, J. concurring) (holding GASBADGE generic for a gas monitoring badge based on the meaning of "gas" and "badge"); *Cummins Engine Co. v. Cont'l Motors Corp.*, 359 F.2d 892 (C.C.P.A. 1966) (holding "TURBODIESEL" generic for "engines having exhaust driven turbine superchargers" based on meaning of "turbo" and "diesel"). It is also consistent with the law of other circuits.[6] This analysis is proper when the

---

[6] *See, e.g.*, *Hunt Masters, Inc. v. Landry's Seafood Rest., Inc.*, 240 F.3d 251, 254 (4th Cir. 2001) ("the principle that a mark must be considered as a whole to determine its validity does not preclude courts from considering the meaning of individual words in determining the meaning of the entire mark"); *Blinded Veterans Ass'n v. Blinded Am. Veterans Found.*, 872 F.2d 1035, 1041 (D.C. Cir. 1989) (finding term "blinded veterans" generic "[s]eparately or together"); *Nat'l Conference of Bar Exam'rs v. Multistate Legal Studies, Inc.*, 692 F.2d 478, 488

purported mark at issue is a compound term; on the other hand, if the purported mark is not a compound term—*e.g.*, a phrase such as SOCIETY FOR REPRODUCTIVE MEDICINE or a mark not wholly made up of words such as 1-888-M-A-T-R-E-S-S—the analysis of the meaning ought to look at the mark as a whole without reference to individual components. *See In re Am. Fertility Soc'y*, 188 F.3d at 1342 (analyzing the phrase SOCIETY OF REPRODUCTIVE MEDICINE as a whole without reference to its components); *In re Dial-A-Mattress Operating Corp.*, 240 F.3d at 1346 (finding 1-888-M-A-T-R-E-S-S not a compound term because "'(888)' is not a word and is not itself a generic term for selling by telephone").

### 3.  The Board reasonably found PRETZEL CRISPS generic for pretzel crackers

#### a.  It was reasonable to conclude that "crisps" means crackers

The evidence of record—including use by the parties themselves and by third parties, dictionary listings, and PTO prosecution practice—easily supports the TTAB's finding that "crisps" is a generic term for crackers.   The record demonstrates that—just as language constantly evolves—so too has the term

---

(7th Cir. 1982) ("Under settled trademark law if the components of a trade name are common descriptive terms, a combination of such terms retains that quality."); *Reese Publ'g Co. v. Hampton Int'l Comm'ns, Inc.*, 620 F.2d 7, 11 (2d Cir. 1980) ("the combination of the two terms 'Video' and 'Buyers Guide' does not . . . destroy their generic nature; if anything, it intensifies it in this context"); *Surgicenters of Am., Inc. v. Medical Dental Surgeries, Co.*, 601 F.2d 1011, 1018 (9th Cir. 1979) (citing *Cummins Engine*, 359 F.2d at 895).

"crisps" in the minds of American consumers who have become increasingly sophisticated in their food choices.

Princeton's generic use of "crisps" was hardly "short-lived" as it misleadingly suggests in its brief.  Appellant's Br. 34.  Indeed, the record shows that Princeton used "crisps" generically on packaging for the majority of the products' lifetime and reinforced the generic meaning of "crisps" by changing the language used in the Nutrition Facts on its packaging from "11 Crisps" to "11 Crackers."  Princeton has also frequently used "crisps" as a generic term in press releases, emails, presentations, and other materials. This objective evidence is consistent with the statements of Princeton's marketing director admitting that "crisps" is a generic term.

In the face of the prominent, long-term generic use of the term "crisps" coupled with the admission of its own marketing director, Princeton proffered the declaration of its founder Warren Wilson, claiming that use of "crisps" on its packaging was "a short-hand reference to the PRETZEL CRISPS product," not to "pretzel crackers generally."  Appellant's Br. 34, 35.  But that just proves the point—by its own admission, Princeton was calling the goods inside its package "crisps," just as it is now calling them "crackers."  There is simply no getting

around the fact that this was a generic use of the term "crisps" for Princeton's products.[7]

Princeton's own use of "crisps" in a generic manner to name its product—combined with its generic use and disclaimer of "pretzel"—puts it squarely in the same boat as the applicant in *In re Gould,* where this Court affirmed the TTAB's finding that SCREENWIPE is generic. The applicant there, like Princeton here, used the separate components of its purported trademark generically on its packaging. 834 F.2d at 1019 ("On its own specimen supporting the application, Gould advises: 'a . . . wipe . . . for . . . screens.'"). This Court found that applicant's specimen "provided the most damaging evidence that its alleged mark is generic." *Id.* The Court's finding is consonant with trademark law in general, as "[a] kind of estoppel arises when the proponent of trademark use is proven to have itself used the term before the public as a generic name, yet now claims that the public perceives it as a trademark." 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 12:13, at 12-47 (4th ed. 2012). Princeton was rightfully found to have used "crisps" generically, strongly supporting the finding that "crisps" is generic for crackers.

---

[7] In any event, Wilson's subjective, self-serving, post-facto declaration of intent would not control or alter how consumers would perceive this persistent generic use of "crisps" in this context.

### b.  The compound term "pretzel crisps" as a whole adds no meaning to its generic constituent words

This Court's binding precedents governing the treatment of generic compound terms are clear.  A term is properly considered to be generic if:  (1) it consists of two generic words joined to form a compound; and (2) the separate words "have a meaning identical to the meaning common usage would ascribe to those words as a compound."  *In re Gould*, 834 F.2d at 1018.  If the two words are joined in a "natural composite form" that "by its nature will convey a specific and correct meaning" of the applicant's goods, it cannot be registered.  *Cummins Engine*, 359 F.2d at 894; *see also In re Gould*, 834 F.21 at 1019 (compound is generic where it "immediately and unequivocally describes the purpose, function and nature of the goods").  Unless the combination is "such a deviation from a natural usage or an unusual unitary combination," *Cummins Engine*, 359 F.2d at 895, or renders the mark "unique or incongruous," *In re Gould*, 834 F.2d at 1018, the compound retains its common descriptive character and is unregistrable.

Princeton completely miscomprehends and misapplies these standards in arguing that the Board erred in finding PRETZEL CRISPS to be a generic term.  For example, it argues that those two words had not previously been used in a unified fashion before it adopted its mark, and therefore Princeton necessarily "added new meaning to the overall term beyond its constituent parts."  Appellant's Br. 33.  But as long ago established by this Court's predecessor, a generic

composite term "cannot become a trademark as a result even of origination and first use." *Cummins Engine*, 359 F.2d at 894; *see also In re Greenliant Sys., Ltd.*, 97 USPQ2d 1078, 1083 (TTAB 2010) ("The fact that an applicant may be the first or only user of a generic designation . . . does not justify registration if the only significance conveyed by the term is that of the category of goods."). The same applies here. Even assuming Princeton was the first to combine the words "pretzel" and "crisps," that does not invest those generic terms with any special or new significance or different commercial impression to support a finding of trademark capability; it simply tells consumers what Princeton's products are: pretzel crackers.

Princeton also disingenuously argues that because not all pretzels are crisp (*e.g.* soft pretzels and pretzel breads), the term "crisps" has "multiple meanings and ambiguities in reference to snack foods" and thus the "term PRETZEL CRISPS as a whole imparts new meaning to consumers and is not a compound term" Appellant's Br. 34-35. But ***all*** of Princeton's goods (described in its registration and application as "pretzel crackers") are crisp, so whether other types of pretzels are crisp is irrelevant. In any event, "it is not required that the name precisely describe and define the goods in order to be incapable of registration." *Cummins Engine*, 359 F.2d at 874. Just as the term "turbodiesel" was "naturally and adequately nominative of engines having exhaust driven turbine superchargers,"

*id.*, so too is "pretzel crisps" naturally and adequately nominative of crisp pretzel crackers.

Just like Princeton's unregistrable "ciabatta crisps" (A8369, 8376), there is nothing unusual about the combination of "pretzel" and "crisps" into the compound "pretzel crisps." The combination is not incongruous, alliterative, rhythmic, or otherwise unusual or distinctive. It is, in the words of Princeton's chief marketing officer, "two pretty generic words." (A8567.) The two words appear in ordinary grammatical construction and immediately and unequivocally convey to consumers that the products at issue are pretzel crackers. Thus, the combination of "pretzel" and "crisps" gains no meaning over and above the generic meaning of its constituent terms, and the entire formulation remains generic and unregistrable.

The declaration of Princeton's founder Warren Wilson further serves as compelling evidence concerning the generic nature of the compound term PRETZEL CRISPS. Wilson noted that other generic terms for pretzel crackers include "pretzel flatz," "pretzel thins," "pretzel chips," "pretzel rounds," "pretzel dippers," and "pretzel snacks." Yet "pretzel crisps" is in no way distinguishable from these syntactically similar and admittedly generic terms. It would be illogical to conclude that combining "pretzel" with terms such as "flatz," "thins," "chips," "rounds," "dippers," and "snacks" results in generic terms for pretzel crackers, but

combining "pretzel" with a word that is synonymous with "crackers" magically results in a protectable mark. The only reasonable conclusion is that combining "pretzel" with "crisps" results in a compound term as generic as the other admittedly generic ones, if not plainly more generic. None of those combinations add any new, transformative meaning to their generic constituents. Thus, in the same way that each of these terms is admittedly generic for Princeton's products, so too is "pretzel crisps."

Unable to come up with a different meaning for its purported mark other than the sum of its components, Princeton attempts to argue that the *Gould* test ought not apply in this case. It first erroneously argues that the *Gould* test only applies "where there is limited direct evidence of the public's understanding of a compound term as a whole." Appellant's Br. 19. Princeton cites absolutely no authority for this assertion, and it flies in the face of this Court's jurisprudence that meeting the *Gould* standard provides clear and convincing evidence of a term's genericness regardless of other evidence.

Second, Princeton argues that PRETZEL CRISPS is a "phrase" and not a compound term. Appellant's Br. 33-35. Yet once again it proffers no compelling evidence or persuasive argument why the term PRETZEL CRISPS should (let alone must) be considered a phrase under this Court's jurisprudence. Tellingly, Princeton repeatedly refers to PRETZEL CRISPS in its brief as a "term" (not a

30

"phrase"), and even concedes that it uses PRETZEL CRISPS as a "combined term" (Appellant's Br. at 13) and "in a unified fashion" (Appellant's Br. 33). PRETZEL CRISPS simply cannot be characterized as a phrase in any rational sense of that word. If PRETZEL CRISPS is not a compound term, it would be hard to imagine one that is.

As a final attempt to circumvent well-established trademark law, Princeton protests that, should the Board's analysis under *Gould* stand, some well-established marks such as CHEESE NIPS, VITAMINWATER, and AMERICAN AIRLINES would never exist. This argument reflects a fundamental misunderstanding of the distinction between descriptive and generic terms. Each of the terms "CHEESE" and "VITAMIN"—while merely descriptive of an ingredient in each of those products—is not generic for the products themselves, and "AMERICAN" is geographically descriptive of the services provided under that mark. In contrast to these examples, both "pretzel" and "crisps" are generic terms for Princeton's products.

The evidence of record reveals that PRETZEL CRISPS is a compound term with no other meaning than pretzel crackers. Thus, the Board's conclusion on this point is more than reasonable.

31

### c.     It was also reasonable to find PRETZEL CRISPS generic when evaluated as a whole without reference to its constituent parts

The record also supports the finding that consumers perceive the purported mark as a whole generically, especially given the use in the media and by third parties of the purported mark PRETZEL CRISPS as a name for a category of products and not as a brand name for Princeton's products. The record contains at least 100 instances of media, competitors, consumers, and others in the food industry using "pretzel crisps" as a generic term.  Indeed, comments from some of Princeton's own consumers show they think of "pretzel crisps" as a product category—even with Princeton's products in hand.

One of the most striking examples of generic use was by Kraft in the highly publicized launch of its RITZ MUNCHABLES products. Princeton tries to minimize the devastating impact of this prominent generic use of "pretzel crisps" by a large national competitor by arguing that Kraft agreed to take a license covering all of its use from inception through phase-out. But this ex post facto, naked, royalty-free "license" does not rewrite history or change the underlying fact that Kraft was using "pretzel crisps" as a generic term, not as a mark. To the contrary, as the agreement between Princeton and Kraft acknowledges and as the images below show, Kraft was using "pretzel crisps" as the generic descriptor for its products throughout the term of this so-called license, then substituted the

generic descriptors "pretzel thins" and "pretzel rounds" when the license ended using similar size, font, stylization, etc.

   

(A5944, 7625, 7643-44, 7655.) As these images make abundantly clear, the trademarks on each package are RITZ MUNCHABLES, while the terms "pretzel crisps," "pretzel thins," and "pretzel rounds" are presented as equally generic names.

The settlement agreement Princeton reached with Kraft is quite telling. The agreement explicitly acknowledges that Kraft was using "pretzel crisps" as a product descriptor and not as a mark, requiring that every use of that term by Kraft "must be accompanied in close proximity by the RITZ MUNCHABLES trademark" and that following the phase-out, Kraft would "stop using . . . 'pretzel crisps' . . . as a product descriptor—*i.e.*, the words commonly used after the product's trademark on packaging to communicate to the consumer what type of product it is." (A7648). In addition, Kraft carefully avoided any admission in the

agreement that "pretzel crisps" is not a generic term, acknowledging only that Princeton owns a trademark registration. (A7650.)

If anything, this so-called license to Kraft makes the situation even worse for Princeton. Not only did the license fail to erase a prominent and highly visible generic use of "pretzel crisps," it took that use a step further—it made it Princeton's own. The agreement explicitly states, "All use by Kraft Foods of the Licensed Mark shall inure to the benefit of Princeton . . . ." (*Id.*) If Princeton's contention that Kraft was a licensee is to be taken seriously, Princeton must accept all of the consequences, with the result that Princeton itself—through its licensee—used "pretzel crisps" as a generic term prominently and extensively on packaging for at least five months.[8]

Finally, one of Princeton's own surveys supports the finding that "pretzel crisps" is a generic term. As explained by Dr. Ross, instead of using the standard language "one company" and "more than one company" used in secondary meaning surveys, *see* Vincent N. Palladino, *Surveying Secondary Meaning*, 84 Trademark Rep. 155, 165–68 (1994), the instructions for the survey conducted by Mr. Mantis mixed in the language used for genericness surveys, instructing respondents to equate "one company" (secondary meaning survey) with "brand

---

[8] Even after the phase-out period ended on July 31, 2010, Kraft's customers were permitted to continue distributing and selling the product in the "RITZ MUNCHABLES pretzel crisps" packaging previously sold by Kraft. (A7649.)

name" (genericness survey) and "more than one company" (secondary meaning survey) with "common name" (genericness survey). (A7690.) In view of these instructions, the findings in the Mantis survey are probative to genericness and show that the primary significance of PRETZEL CRISPS was a common name (47.8%) rather than a brand name (38.7%). (A7692.) As Dr. Ross concluded, the Mantis survey supports the conclusion that PRETZEL CRISPS "functions in the minds of consumers as a common name, not as a brand name." (*Id.*)

In light of the use by the media and third parties, and given the survey evidence, it was reasonable for the Board to conclude that the purported mark PRETZEL CRISPS as a whole is generic.

**4.    The objections raised by Princeton and amicus are either wrong or insufficient to overcome the Board's reasonable finding**

### a.    Princeton confuses questions of law and fact

There is no dispute on what the relevant legal standards are. The proper factual inquiry is that laid out in *Marvin Ginn*, which the Board accurately quoted and applied. *See Frito-Lay*, 109 USPQ2d at 1952 (quoting *H. Marvin Ginn Co.*, 782 F.2d at 990). The Board also cited this Court's leading cases on the evidentiary standards to apply when confronted with compound terms, namely *Gould* and *American Fertility Society*, which confirmed the general rule that the genericness inquiry focuses on obtaining the understanding of a purported mark as a whole and the specific rule in the case of compound terms wherein one can demonstrate the

understanding of the mark as a whole by showing the genericness of the components and the lack of additional meaning upon combination. *See Frito-Lay N. Am.*, 109 USPQ2d at 1952 (citing *In re Gould*, 834 F.2d 1017 and *In re Am. Fertility Soc'y*, 188 F.3d at 1347). The Board made no errors of law in explaining these binding legal standards. Despite this absence of legal error, Princeton nevertheless attempts to turn this appeal into a question of law rather than a question of fact through specious argumentation.

Princeton first asserts that the Board imagined a conflict between *Gould* and *American Fertility* that does not really exist and argues that "[w]hether the Board applied the correct legal standard in evaluating a mark is a question of law," citing *In re Dial-a-Mattress-Corp.*, 240 F.3d 1341, and *In re American Fertility Society,* 188 F.3d at 1347. Appellant's Br. 11, 15-16. Princeton's approach is incorrect on at least two fronts.

First the Board did not characterize *Gould* and *American Fertility* as being opposed to one another. In fact, the Board recognized that *American Fertility* confirmed the viability of using the *Gould* method to demonstrate the meaning of a compound term as a whole. *See Frito-Lay*, 109 USPQ2d at 1953 (citing *Am. Fertility Soc'y*, 188 F.3d at 1348).

Second, *American Fertility* and *Dial-A-Mattress* have different fact patterns than this case. In *American Fertility*, there was no dispute below that SOCIETY

FOR REPRODUCTIVE MEDICINE was a phrase, not a compound term. *See* 188 F.3d at 1343 (noting that the examining attorney refused registration "unless the Society disclaimed the phrase SOCIETY FOR REPRODUCTIVE MEDICINE"). Given that undisputed fact, the Court disagreed that *Gould*, which "on its facts, language, and holding" concerned compound terms, could be extended to phrases. *Id.* at 1348. In stark contrast, the parties here disputed whether PRETZEL CRISPS is a phrase or a compound term, and the factual record supports the Board's reasonable conclusion that it is a compound term. *Dial-A-Mattress* dealt with 1-888-M-A-T-R-E-S-S, a purported mark consisting of words and numbers, not a purported mark solely consisting of words. *See* 240 F.3d at 1346. When the PTO argued on appeal that *Gould* applied because "(888)" was a generic term along with "MATTRESS" and that their union provided no additional meaning, the Court noted that the PTO "provided no justification for this conclusion" and further noted that "(888) is not a word and is not itself a generic term for selling by telephone." *Id.* at 1345-46. Here, the factual record supports the Board's factual findings that the purported mark consists entirely of words generic for the goods at issue (not words and numbers), and the terms combined as a compound have no new meaning apart from the generic meaning of the individual components.

Thus, Princeton's approach here in focusing on the Board's *selection* of the correct legal standard to apply puts the cart before the horse. Before the fact-finder

can apply the proper evidentiary standard for weighing the evidence on genericness, it must first make the factual determination of whether the purported mark is a compound term or a phrase. This factual conclusion has been at the heart of the dispute between the parties, with Frito-Lay asserting that the mark is a compound term and Princeton asserting that the mark is a phrase. But as noted above, the evidentiary record easily supports the conclusion that PRETZEL CRISPS is a compound term.

That genericness is a question of fact and not law is well settled. *E.g.*, *In re Hotels.com*, 573 F.3d at 1302. Princeton has cited no authority and made no argument, either at trial or in its appeal brief, suggesting that the determination of whether a purported mark is a compound term or a phrase is anything but part of the traditional factual inquiry into genericness, and its citations of *Dial-A-Mattress* and *American Fertility* do not support a departure from that inquiry. Indeed, it would be hard to argue such a departure based on those cases, as the decisions reiterate that genericness is a pure question of fact and focus on the appropriate evidentiary standard to apply when making that assessment. *See Dial-A-Mattress Operating Corp.*, 240 F.3d at 1344 ("Placement of a term on the fanciful-suggestive-descriptive-generic continuum is a question of fact."); *Am. Fertility Soc'y*, 188 F.3d at 1347 (looking at the evidence of meaning as a whole). Those cases, properly interpreted, instead merely stand for the proposition that when there

is not substantial evidence in favor of treating the purported mark at issue as a compound term, the mark should be analyzed as a whole without reference to the possibly generic parts. In this case, because the Board reasonably concluded on the facts that PRETZEL CRISPS was a compound term, not a phrase, its selection of the *Gould* evidentiary standard, affirmed in *American Fertility* and followed for decades prior and after, was entirely correct.

Princeton also claims that there are two additional issues for review beyond the substantial evidence review: whether "as a matter of law, the evidence in the stipulated record compels the finding" that PRETZEL CRISPS is (1) not generic and (2) a descriptive mark. Appellant's Br. 1-2, 22. These issues are not appropriate; they purport to challenge the Board's factual finding that PRETZEL CRISPS is generic based on a standard of review that is inapplicable to factual questions. Princeton cites no authority for its "as a matter of law . . . compels the finding" standard. *See* Appellant's Br. 22. Instead, the Board's placement of the term PRETZEL CRISPS on the "fanciful-suggestive-descriptive-generic continuum" is simply an issue of fact reviewed for substantial evidence, not a question of law reviewed de novo. *In re Nett Designs, Inc.*, 236 F.3d 1339, 1340 (Fed. Cir. 2001); *accord In re Nordic Naturals*, 755 F.3d at 1342.

Additionally, it is premature for the Court to consider whether PRETZEL CRISPS is merely descriptive. The Board did not reach Frito-Lay's alternative

grounds for opposition and cancellation, namely, that PRETZEL CRISPS is so highly descriptive as to be incapable of registration under the doctrine of *In re Boston Beer Co.*, 198 F.3d 1370 (Fed. Cir. 1999), or that PRETZEL CRISPS is merely descriptive without secondary meaning pursuant to Section 2(e)(1) of the Lanham Act, 15 U.S.C. § 1052(e)(1). The Court ought not consider those issues absent the Board's findings of fact, and the Court need not remand for that consideration because the Board's conclusion that the purported mark is generic was reasonable and dispositive.

To the extent Princeton is attempting to argue through these issues that summary judgment should have been granted, *see* Appellant's Br. 22, Princeton has a steep uphill battle that it cannot meet. This Court reviews denial of summary judgment "with considerable deference to the [trial] court" such that the Court "would have to find that the facts were so clear that the denial of summary judgment was an unquestioned abuse of discretion." *SunTiger v. Sci. Research Funding Grp.*, 189 F.3d 1327, 1333, 1334 (Fed. Cir. 1999). In that particular case, the Court noted that the denial of summary judgment turned on a question of fact. *Id.* at 1334.  After outlining the relevant evidence submitted by the parties on that issue, the Court noted that such an evidentiary record "belies any such finding" of an unquestioned abuse. *Id.* Given the voluminous evidence in favor of genericness

here, Princeton's argument is also doomed; the Board's decision to defer the issue to final hearing was in no way an unquestioned abuse.

Given that this case turns on a factual issue which the Board appropriately resolved, Princeton's assertion of review "as a matter of law" should be rejected.

### b.     The Board did not fail to consider the record

In several places, Princeton argues that the Board's failure to mention various pieces of evidence means the Board ignored that evidence. *E.g.*, Appellant's Br. 24, 27. This Court has rejected such an argument before many times: "The mere fact that the district court does not include findings on all the evidence is not indicative that it was not considered." *N.V. Akzo v. E.I. DuPont de Nemours*, 810 F.2d at 1152 n.5; *accord Winner Int'l Corp.*, 905 F.2d at 376; *J.P. Stevens Co.*, 822 F.2d at 1053.[9]

---

[9] Illustrative is Princeton's argument that the Board "failed to consider … voluminous evidence that those in the snack food industry use the term PRETZEL CRISPS to refer to Snack Factory's product," citing declarations from four "independent" distributors that it asserts "are compelling evidence that the PRETZEL CRISPS mark is not generic." Appellant's Br. 26-27. In reality, these distributors have strong financial ties to Princeton as they sell millions of dollars' worth of PRETZEL CRISPS products. (A5584, 5588, 5593, 5597.) The Board rightfully gave these biased statements little or no weight in its genericness analysis. *Mag Instrument, Inc. v. Brinkman Corp.*, 96 USPQ2d 1701, 1723 (TTAB 2010) (declarations from applicant's sales representatives "have little persuasive value"); 2 McCarthy, *supra*, § 12:13, at 12-50 ("Trademark law is skeptical of the ability of an associate of a trademark holder to give an impartial account of the value of the holder's mark.").

But in addition to this incorrect argument, Princeton seriously misconstrues *Recot, Inc. v. Becton*, 214 F.3d. 1322 (Fed. Cir. 2000), as standing for the proposition that "failure to consider the entire record in reaching its decision is grounds for reversal."  Appellant's Br. at 23.  In no way does *Recot* stand for that holding, and Princeton's poor interpretation again demonstrates its failure to properly segregate issues of law and fact in its analysis. *Recot* was an opposition based on likelihood of confusion, an issue of law based on underlying factual determinations as to the factors of confusion. *Id.* at 1326 (citing *Lloyd's Food Prods., Inc. v. Eli's, Inc.*, 987 F.2d 766, 767 (Fed. Cir. 1993)); *Kenner Parker Toys Inc. v. Rose Art Indus., Inc.*, 963 F.2d 350, 352 (Fed. Cir. 1992). One of those factors is the fame of the mark. *See id.* at 1328 (citing *Kenner Parker*, 963 F.2d at 352). In that case, the Court agreed with the Board's factual finding that the fame of Recot's mark FRITO-LAY was "unquestionably established" but disagreed with its legal conclusion concerning how fame factors into the confusion analysis. *Id.* at 1328; *see id.* ("Yet the Board did not treat the fame factor as 'important' in this case . . . ."). Nowhere was that case based on a failure to consider the evidentiary record in making a factual determination.

### c.     The Board did not cherry-pick the media evidence

Princeton further asserts that the Board "cherry picked" media references in the record, choosing only those that supported genericness without taking into

account others that referred to "pretzel crisps" as a brand. Appellant's Br. 24-25.

Princeton argues that the Board has done this before, citing *In re Merrill Lynch,*
*Pierce, Fenner & Smith*, 828 F.2d 1567 (Fed. Cir. 1987). Appellant's Br. 25. This
argument is also wrongheaded.

First, *Merrill Lynch* and this case have completely different procedural
postures, standards of proof, and standards of appellate review. *Merrill Lynch* was
an *ex parte* appeal, where the standard of proof on the PTO to prove genericness is
clear and convincing evidence. *See Merrill Lynch,* 828 F.2d at 1571 (citing
*Trademark Manual of Examining Procedure* § 1305.04 (Rev. 1983)). This case is
an *inter partes* proceeding, where the standard of proof is mere preponderance.
*E.g.*, *Magic Wand*, 940 F.2d at 642. In *Merrill Lynch*, the Court reviewed for clear
error. *Merrill Lynch*, 828 F.2d at 1570. Here, post-*Dickinson*, the Court reviews for
substantial evidence, which is significantly more deferential to the agency below.
*See SSIH Equip, S.A.*, 718 F.2d at 382 ("A 'substantial evidence' standard restricts
an appellate court to a greater degree than 'clearly erroneous' review.").

Second, the evidence of record in *Merrill Lynch* consisted merely of
newspapers and financial publications. *See* 828 F.2d at 1570. Here, even if the
Board somehow "cherry picked" generic uses of "pretzel crisps" by the media
(which it did not), there is ample other evidence supporting its genericness finding,

including dictionary definitions; generic use by Princeton, competitors, and consumers; and survey evidence. Thus, *Merrill Lynch* is inapposite.

Finally, and most importantly, there was no cherry picking in the evidentiary record here. Although Princeton claims that only 36 of 224 articles from its LexisNexis search arguably use the term "pretzel crisps" generically (see Appellant's Br. 7, 23), an objective review of the articles themselves reveals that the number of generic references is much higher, more on the order of 86. *See* A6912-14, 6928-30, 6932-33, 6938, 6946, 6969-70, 6973, 6989-90, 6999-7000, 7004-06, 7007-09, 7013-15, 7016-17, 7019, 7020, 7023-24, 7033-34, 7047- 7048-49, 7053-55, 7056-57, 7058-59, 7062, 7064-65, 7065-66, 7067-68, 7072, 7077, 7085-86, 7091-92, 7092-93, 7096-97, 7101-02, 7103-04, 7117 (55 articles using "pretzel crisps" generically with no reference to Princeton[10]); A7040, 7049-50, 7051-52, 7062-63, 7068-70, 7072-73, 7076-77, 7082-83, 7084-85, 7089-90, 7094-95, 7097 (15 articles referencing Snack Factory but also using "pretzel crisps" generically[11]); A6960, 6961-62, 6964, 7035-36, 7037-39, 7039-40, 7042-45 (16

---

[10] These articles are identified in the LexisNexis search report as Documents 11, 12, 29-32, 34, 35, 42, 55, 88, 95, 117, 118, 132, 133, 141-143, 145-148, 155-158, 160, 161, 164, 166, 171, 187, 211, 214, 223, 224, 227, 228, 230, 231, 238, 241, 243, 247, 254, 263, 276, 286, 287, 289, 296, 305, 308, and 330.

[11] Identified in the search report as Documents 198, 216, 218-220, 239, 248, 249, 255, 262, 272, 275, 284, 293, and 297.

articles referencing RITZ MUNCHABLES pretzel crisps[12]).).    As for the remainder of the articles (many of which are duplicative), it is hardly surprising that a majority of articles in a search like that refer to "Pretzel Crisps" as a brand name, given that Princeton claims it is the only manufacturer using this term in the pretzel industry.  *See In re Greenliant Sys., Ltd.*, 97 USPQ2d  at 1083 ("because applicant may be the only user of the compound term NANDRIVE, its internet and Lexis/Nexis hits are going to be heavily skewed to articles referencing applicant."). In total, the record contains over 100 media, competitor, and consumer uses of "pretzel crisps" as a generic term rather than as a brand name. Given such extensive evidence, a reasonable person could have found that those references were more persuasive than the ones that Princeton likes most.

### d.    Princeton's complaints concerning the adequacy of the Board's reasoning are misplaced

In the face of the Board's alternative conclusion that PRETZEL CRISPS would be generic even if it were considered a phrase instead of a compound term, Princeton argues that the Board issued an impermissible conclusory statement, citing *In re Sang-Su Lee,* 277 F.3d 1338 (Fed. Cir. 2002). Princeton's reliance on *Sang-Su Lee* is misplaced. First, *Sang-Su Lee* involved an agency decision that introduced matters not included in the evidentiary record. The Board of Patent

---

[12] Identified in the search report as Documents 75, 77, 81, 190, 193-195, 197, and 201-208.

Appeals and Interferences brought evidentiary considerations into its decision regarding the obviousness of an invention that were not part of the record, making a conclusory statement that "common knowledge and common sense" required a finding of obviousness that precluded the issuance of a patent. *Id.* at 1341. The Court held that this violated the Administrative Procedure Act. *Id.* at 1342-43 (noting that obviousness determinations "must be based on evidence"). Later cases keep the holding of *Sang-Su Lee* within the bounds of ensuring that an evidentiary record exists. *See, e.g.*, *In re Kahn*, 441 F.3d at 989. Here, Princeton does not argue that the Board relied on matters outside the evidentiary record, and doing so would be futile as the Board plainly based its decision on the record evidence. Thus, *Sang-Su Lee* is not on point.

Given the post-judgment procedural posture, Princeton has another difficult burden to overcome. If Princeton thought that the Board's reasoning was too incomplete to support its conclusion that PRETZEL CRISPS would be generic as a phrase, Princeton should have filed a post-judgment request pursuant to 37 C.F.R. § 2.129(c) that the Board modify its decision to provide more specificity or completeness regarding that conclusion. Because Princeton failed to do so (*see* A30, 33), it cannot now complain about the lack of specificity or completeness in those findings. *See Glaverbel S.A. v. Northlake Mktg.*, 45 F.3d 1550, 1555 (Fed. Cir. 1995); *see also Consol. Aluminum Corp. v. Foseco Int'l Ltd.*, 910 F.2d 804,

814 n.9 (Fed. Cir. 1990) (noting that an aggrieved party should address incomplete findings first before the trial court rather than "head off to the appellate court to seek a remand for the making of those same findings"). Importantly, the appellant in *Sang-Su Lee* fulfilled this prerequisite to review. *In re Sang-Su Lee*, 277 F.3d at 1341. Princeton did not.

### e.    Princeton and amicus misinterpret the Board's conclusions on the survey evidence

Both Princeton and amicus curiae Council of American Survey Research Organizations (CASRO) take issue with the Board's approach toward the Jay survey. They argue that the Board erred in not giving it greater weight over the other evidence when the Board "found no fault" in the survey. *See* Appellant's Br. 32-33; CASRO's Br. 3, 10, 13. CASRO is particularly concerned that the Board's approach will have some binding effect on the weight to be given surveys in later cases. CASRO's Br. 3, 13-14. These arguments and concerns are unwarranted.

First, both Princeton and CASRO incorrectly assume that the Board found no flaws in the Jay survey. That is not a correct interpretation of the Board's factual findings, as can be seen by the Board's own reasoning and its ultimate conclusion.

In its opinion, the Board identified substantial flaws in the Jay survey, noting Dr. Simonson's criticism that "less than 65% of the initial group 'of qualified respondents' was entered into the survey due to the underinclusive nature of the

questions, and that accordingly, the Jay survey is flawed." *Frito-Lay N. Am.*, 109 USPQ2d at 1958. Soon after noting these defects, the Board decided to give controlling weight to the non-survey evidence in this case, citing a decision that stands for the proposition that in the face of flawed surveys, the Board can rely solely on other evidence of genericness. *See In re Hotels.com LP*, 573 F.3d at 1305-06. In light of the Board's discussion of the competing surveys in this case and its citation of *Hotels.com*, it is reasonable to infer that the Board found that the Jay survey was flawed, or at least was not compelling enough to overcome the non-survey evidence and the contrary survey results in both the Simonson and Mantis surveys. *See id.* (affirming genericness finding despite a TEFLON survey in which 76% of respondents regarded term as brand name); *Classic Foods Int'l Corp. v. Kettle Foods, Inc.*, 468 F. Supp. 2d 1181, 1193 (C.D. Cal. 2007) (finding KETTLE generic for potato chips despite survey evidence that 52% of consumers viewed it as a brand name). To the extent Princeton desires more explicit conclusions from the Board regarding the Jay survey, that should have been the subject of a motion for reconsideration or modification under 37 C.F.R. § 2.129(c), which as noted before Princeton did not file. Absent such motion, the Court should draw inferences concerning any absent findings that would have been essential to resolving the issue. *See Glaverbel S.A.*, 45 F.3d at 1555.

Furthermore, CASRO's concerns of improper precedential effect are unfounded. The Board specifically limited its findings here to the factual record before it. *Frito-Lay*, 109 USPQ2d at 1960 ("In making *this determination*, while we consider the entirety of the record, including the surveys (which in any event arrive at different conclusions), we give controlling weight to the dictionary definitions, evidence of use by the public, including use by the media and by third-parties in the food industry, and evidence of use by defendant itself." (emphasis added)). The Board in no way held or even suggested that non-survey evidence should ***always*** be given controlling weight over survey evidence. The sky is not falling with respect to the proper role of survey evidence in genericness inquiries. Rather, surveys are and remain simply one type of evidence relevant to genericness, and just like other types of evidence, depend upon issues of credibility and reliability in each specific case.

Moreover, survey evidence may be irrelevant when the term at issue is generic from the outset. In such circumstances, a genericness survey actually may be measuring *de facto* secondary meaning. *See, e.g.*, *Schwan's IP, LLC v. Kraft Pizza Co.*, 460 F.3d 971, 975-76 (8th Cir. 2006) (holding BRICK OVEN generic for pizza and survey properly omitted from analysis); *Hunt Masters, Inc. v. Landry's Seafood Rest., Inc.*, 240 F.3d 251, 255 (4th Cir. 2001) (holding consumer survey irrelevant and CRAB HOUSE generic for a class of restaurants that serve

crabs); *Miller Brewing Co. v. Jos. Schlitz Brewing Co.*, 605 F.2d 990, 995 (7th Cir. 1979) (holding survey evidence irrelevant and LITE generic for low-calorie beer). Thus, because Princeton's purported mark PRETZEL CRISPS is and always has been merely a combination of two generic terms that in no way alters their generic meaning, the Board could have reasonably disregarded the Jay survey as measuring *de facto* secondary meaning.

### f.    Princeton fails to establish any inconsistency in Board decisions

As a last ditch attempt to vest this case with some policy significance, Princeton asserts that the Board has been inconsistent in its treatment of marks as phrases or as compound terms such that trademark applicants can no longer determine whether their marks are going to pass or be refused. It urges the Court to take corrective action. Princeton cites several non-precedential decisions of the Board on the genericness of particular marks yet provides no explanation as to why it believes the Board decided them wrongly or inconsistently. Nowhere is there authoritative support or argument beyond expression of vague displeasure by one aggrieved trademark applicant.

The best Princeton can do in attempting to provide authority is to quote a practitioner's blog commentary on this case, but that commentary also does not contain argument or authority that the Board has been inconsistent. Any perceived dichotomy in the way marks are analyzed is due to the fundamental concept that

each proposed mark must be assessed on its own merits.  There can be no hard and fast rule about which marks should be analyzed as compound terms or as phrases because each factual investigation is case specific.  The meaning of a particular purported mark depends on the products or services with which the mark is associated and the potential consumers. Given those variables, the factual record may be different given different parties, markets, and other situations, which is what makes a case-by-case factual analysis completely appropriate.

As a policy matter, companies can ensure that a purported mark will not be later adjudicated as generic by selecting marks that are not merely ordinary combinations of two generic terms.  Princeton's predicament could have been avoided had it simply selected a more imaginative mark. Instead, it decided to use two generic words that, when combined, tell the consumer exactly what kind of product it is: pretzel crisps.  This was the risk that Princeton and others like it run when selecting a brand consisting of such generic terms. It would be a mistake to overturn settled trademark law and allow for the monopolization of a category name solely because a party made a foreseeably bad business decision. Like Esau, Princeton must now live with its choice of lentils in lieu of inheritance.

## CONCLUSION

The record is replete with evidence that PRETZEL CRISPS is generic for "pretzel crackers." The Board's factual conclusion to that effect was more than reasonable, and the Board committed no legal error. The Court should affirm the Board's judgment.

Dated:  September 25, 2014                  Respectfully submitted,

                                            /s/ William G. Barber
                                            William G. Barber
                                            Paul Madrid
                                            PIRKEY BARBER PLLC

                                            *Attorneys for Appellee,*
                                            *Frito-Lay North America, Inc.*

## **CERTIFICATE OF SERVICE**

I certify that I served a copy on counsel of record on September 25, 2014 by electronic means (CM/ECF).

Dated:  September 25, 2014

<div style="margin-left: 40%;">

/s/ William G. Barber
William G. Barber
PIRKEY BARBER PLLC
600 Congress Avenue, Suite 2120
Austin, Texas 78701
(512) 322-5200 Telephone
(512) 322-5201
bbarber@pirkeybarber.com

</div>

## <u>CERTIFICATE OF COMPLIANCE</u>
## <u>WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS,</u>
## <u>AND TYPE STYLE REQUIREMENTS</u>

1.      This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).  The brief contains 11,892 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(b)(iii).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). The brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman.


Dated:  September 25, 2014            /s/ William G. Barber
                                     William G. Barber

                                     *Attorney for Appellee,*
                                     *Frito-Lay North America, Inc.*